**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JON R. NEUMANN, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 4:26-cv-1968 |
| DAWN M. BESSERMAN, NATHANIEL MUDD, MARCUS E. RAICHLE JR., and CHRISTIAN H. HARTLEY, | ) | |
| Defendants. | ) | |

# COMPLAINT FOR SPECIFIC PERFORMANCE IN AID OF ARBITRATION

COMES NOW, Plaintiff Jon R. Neumann ("Neumann"), by his undersigned counsel, submits his Complaint for Specific Performance in Aid of Arbitration against Defendants Dawn M. Besserman ("Besserman"), Nathaniel Mudd ("Mudd"), Marcus E. Raichle Jr. ("Raichle"), and Christian H. Hartley ("Hartley") (collectively, "Defendants"), and alleges as follows:

## NATURE OF THE CASE

1. This case arises from Defendants' expulsion of Plaintiff from the law firm Maune Raichle Hartley French & Mudd, LLC (the "Firm").

2. The Firm is a 100-lawyer plaintiffs' firm that represents mesothelioma victims and their families.

3. Neumann was one of its top producers and an equity member for more than a decade.

4. On September 9, 2026, in a twelve-minute video call, Defendants expelled Neumann from the Firm so he could not veto their self-interested and conflicted plan to restructure

the Firm's equity and compensation framework in a way that benefitted each of them personally to the detriment of the other equity holders, including Neumann.

5. On November 12, 2026, Neumann filed a separate demand for arbitration pursuant to the Firm's Operating Agreement to recover his significant financial losses caused by Defendants' wrongdoing. A copy of the Operating Agreement is attached hereto and incorporate herein by reference as Exhibit 1.[1]

6. Although the Firm's members agreed in Section 11.15 of the Operating Agreement to arbitrate their disputes, Section 11.13 authorizes any member to demand specific performance of the Operating Agreement and to obtain injunctive relief in a court of competent jurisdiction.

7. Neumann therefore brings this action in aid of arbitration to enforce one of his discrete contractual rights: his right, as an expelled member, to inspect the Firm's books and records under Section 8.6(a)(i) of the Operating Agreement.

8. Under the Tenth Amendment to the Operating Agreement, upon a member's expulsion, a process gets triggered to determine the value of the Firm in order to pay the expelled member the "Fair Value" of his or her units. The Operating Agreement requires the parties first to negotiate the value of the Firm, which it defines as "Company Value," in good faith and reasonably. If the parties do not agree to the value within sixty days, the Firm's regular accountants are to determine Company Value at the expelled member's expense. That determination is binding and conclusive on the parties, absent fraud, bad faith, or mathematical error.

[1] Given the confidential nature of the Operating Agreement and its amendments (Exhibits 1-3), Plaintiff will seek leave to file same under seal under the Local Rules of the United States District Court for the Eastern District of Missouri.

9. Neumann has repeatedly tried to negotiate Company Value with Defendants and the Firm. As part of that process, he requested certain financial documents to which he no longer has access and are in the Firm's sole possession, custody, and control.

10. Yet, Defendants have not only refused to provide any records, but have also unilaterally decided to skip the negotiation phase altogether and tender the valuation to the Firm's accountant.

11. By withholding the requested documents from Neumann, Defendants have hampered his ability to negotiate Company Value. And by tendering the valuation to the accountant, Defendants have skipped the negotiation process in an effort to foist the costs of the valuation onto Neumann. In all events, Neumann cannot assess whether the accountant's valuation is being conducted without fraud, bad faith, or mathematical error without the underlying financial records.

12. The relief Neumann seeks here is narrow. He asks this Court to order Defendants to permit inspection and copying of the Firm's books and records, or to cause the Firm to do so, so that the valuation process can proceed on an informed basis, and to award him his attorney's fees and related costs. Neumann's remaining claims will be decided in arbitration.

## PARTIES

13. Neumann is an individual and licensed attorney who resides and is domiciled in Wisconsin. He joined the Firm as an associate in October 2011. He became an equity member on January 1, 2015, and remained one until his expulsion on September 9, 2026. At the time of his expulsion, he held 4.06 units, representing at least 7.4687% of the Firm's equity.

14. Raichle, Mudd, and Hartley are all members of the Firm's Board of Managers, which manages the Firm under Section 5.1 of the Operating Agreement. Besserman is the Firm's Managing Member but is not a member of the Board.

15. Neumann is a citizen of Wisconsin. He resides in Wisconsin, intends to remain there indefinitely, and was domiciled in Wisconsin when this action was filed.

16. Besserman is a citizen of Florida. On information and belief, she resides in Florida, intends to remain there indefinitely, and was domiciled in Florida when this action was filed.

17. Mudd and Hartley are both citizens of South Carolina. On information and belief, each resides in South Carolina, intends to remain there indefinitely, and was domiciled in South Carolina when this action was filed.

18. Raichle is a citizen of Missouri. On information and belief, he resides in Missouri, intends to remain there indefinitely, and was domiciled in Missouri when this action was filed.

19. The Firm is not a party to this action. Neumann seeks relief only against Defendants, each of whom is a party to the Operating Agreement, owes Neumann the obligations at issue, and has the authority to cause the Firm to permit inspection.

## **VENUE AND JURISDICTION**

### **Subject Matter Jurisdiction**

20. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between Plaintiff, a citizen of Wisconsin, and each Defendant, citizens of Florida, South Carolina, and Missouri, and the amount in controversy exceeds $75,000, exclusive of interest and costs. No Defendant is a citizen of the same state as Plaintiff. Neumann does not invoke federal question jurisdiction; the Federal Arbitration Act does not itself confer subject matter jurisdiction, and Neumann's claim arises under the Operating Agreement and Missouri law.

21. Where, as here, the plaintiff seeks equitable relief, the amount in controversy is measured by the value to the plaintiff of the right sought to be enforced. *Am. Fam. Mut. Ins. Co. v.*

*Vein Ctrs. for Excellence, Inc.*, 912 F.3d 1076, 1081 (8th Cir. 2019); *see also Kopp v. Kopp*, 280 F.3d 883, 885 (8th Cir. 2002).

22. The value to Neumann of the specific performance he seeks exceeds $75,000. The books and records are the only means by which Neumann can negotiate Company Value and test any accountant's determination, which will otherwise be binding and conclusive and will fix the Fair Value of his 4.06 units. Even using prior valuations the Firm obtained that are now out of date and too low, the Fair Value of Neumann's units exceeds $9 million, so even a small percentage error in Company Value would exceed $75,000. Neumann will also bear the cost of the accountant's valuation, and he seeks his attorney's fees under Section 11.19 of the Operating Agreement. In the related arbitration, which this action is brought to aid, Neumann seeks damages of no less than $25 million.

**Personal Jurisdiction**

23. This Court has personal jurisdiction over each Defendant. Raichle is domiciled in Missouri. In addition, all Defendants have consented to jurisdiction and venue in the Eastern District of Missouri under Section 11.21 of the Operating Agreement, which states:

> The Company, the Members and the Managers hereby consent to the exclusive personal jurisdiction of the state and federal courts located in the State of Missouri for purposes of any suit, action or other proceeding arising out of this Agreement, waive any argument that venue in any such forum is not convenient and agrees that the venue of any litigation initiated by either of them in connection with this Agreement shall be in either the Circuit Court of St. Louis County, Missouri, or the United States District Court, Eastern Division of the Eastern District of Missouri.

(Ex. 1.)

24. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred here, including the Firm's management from its principal office in St. Louis, Missouri (1015 Locust St #1200, St. Louis, MO 63101) and

Defendants' refusal to permit inspection of books and records maintained there. Venue is also proper by virtue of the parties' agreement in Section 11.21. Assignment to the Eastern Division is proper under E.D. Mo. L.R. 3.1.

## GENERAL ALLEGATIONS

### The Parties, The Firm, And The Operating Agreement

25. Neumann joined the Firm as an associate in October 2011 and became an equity member on January 1, 2015.

26. The Firm is a Missouri limited liability company organized to practice law, with its principal office in St. Louis, Missouri. The Firm is not named as a defendant.

27. The Firm's ownership interests are units.

28. By September 2026, Neumann held 4.06 units of the Firm, which represented at least 7.4687% of its equity.

29. The Firm is governed by an Operating Agreement dated January 1, 2011, as amended. The Operating Agreement is attached as Exhibit 1. The Tenth Amendment (which is cited herein) is attached as Exhibit 2. The Thirteenth Amendment (which shows that all Defendants are parties) is attached as Exhibit 3.[2]

30. The Operating Agreement vests management in a Board of Managers (the "Board") and a Managing Member appointed by the Board.

31. Since at least 2023, the Board has consisted of Defendants Raichle, Mudd, and Hartley.

---

[2] Because the Operating Agreement is subject to confidentiality obligations, Neumann has not attached the Exhibits containing or reflecting its confidential terms to this filing. Neumann will separately move for leave to file those Exhibits under seal and will tender them to the Court in connection with that motion.

32. Since summer of 2023, Besserman has acted as the Firm's Managing Member.

33. Neumann and Defendants are all parties to the Operating Agreement, as amended by its Thirteenth Amendment.

**The Restructuring And Neumann's Expulsion**

34. In or around late 2025, Defendants began to plan for a transaction that would significantly reallocate the Firm's equity, alter the way it compensates the equity members, and change certain member protections in the Operating Agreement.

35. The restructuring plan would require one or more amendments to the Operating Agreement.

36. Those amendments to the Operating Agreement required unanimous consent among the Firm's voting members. (Ex. 1 § 11.2.)

37. Defendants announced aspects of the plan on January 6, 2026. They provided more details during the first quarter of 2026, but the plan was a "work in progress" and key details continued to change.

38. Neumann asked detailed questions about the plan, including about how equity would be allocated, how the compensation structure would look moving forward, and what the alternative structures were.

39. Defendants were not interested in negotiating. They repeatedly announced that the restructuring would be a take-it-or-leave-it deal and that any Firm members who would not accept it could and would be expelled.

40. Defendants demanded that Neumann agree to the plan or face expulsion even though key aspects of it continued to change and they never provided Neumann with a "final" and executable plan to which he could assent.

41. At some point in mid-2026, Defendants decided that they would expel Neumann from the Firm instead of trying to obtain his consent to the restructuring.

42. Defendants offered Neumann a non-equity employment position at a drastically reduced compensation level.

43. Neumann did not accept that position and repeatedly requested that Defendants provide details about the restructuring transaction so that he could evaluate it.

44. Defendants never provided the requested information.

**Defendants Expel Neumann From The Firm**

45. On the morning of September 9, 2026, Neumann joined a video call with Defendants. The call lasted twelve minutes.

46. Defendants told Neumann that he was expelled. Besserman then offered Neumann a contract-attorney arrangement on the terms previously proposed and that Neumann had already rejected.

47. At about 5:15 p.m. Central Time the same day, the Firm cut off Neumann's access to its email and case-management systems.

**The Fair Value Process Under The Agreement**

48. The Operating Agreement sets forth certain rights that an expelled member has.

49. Section 8.5(c) provides that a member who is expelled "shall . . . be entitled to receive from the [Firm] the Fair Value, determined as of the date of expulsion in accordance with Section 8.3(b)."

50. "Fair Value" is defined as "(a) the Company Value multiplied by (b) the Percentage Interest of the withdrawing or expelled Member." "Company Value" is "the price at which the [Firm] would be sold to a willing buyer by a willing seller." And "Percentage Interest" is "the ratio,

expressed as a percentage, that the Units held of record by such Member bear to the total issued and outstanding Units."

51. Section 8.3(b) of the Operating Agreement, titled "Voluntary Withdrawal," sets forth mechanisms to assess Company Value, and in turn, Fair Value, when a member withdraws from the Firm. It was subsequently amended and replaced by Section 8.3(c) of the Tenth Amendment. (Ex. 2.)

52. Section 8.3(c) of the Tenth Amendment provides that the Firm "shall purchase from the withdrawing Member, and the withdrawing Member shall sell to the [Firm], all of such Member's Units in exchange for the Fair Value as of the date of withdrawal." (Ex. 2.)

53. The Tenth Amendment provides a two-step process for how the parties are to arrive at Fair Value (which is defined as a fraction of "Company Value").

54. *First*, the Tenth Amendment states that "in calculating the Fair Value, the Company Value shall be the amount mutually agreed upon between the parties to the sale, purchase and/or redemption in good faith and reasonably."

55. *Second*, the Tenth Amendment states that:

> [I]f no agreement shall be reached within sixty (60) days following the withdrawal, the Company Value shall be determined by the firm of independent public accountants then regularly retained by the Company or, if none, by a firm of independent public accountants selected by the Board of Managers to make such determination. If a firm of independent public accountants makes such determination, it shall be binding and conclusive on the parties, absent fraud, bad faith or mathematical error, so long as determined in accordance with the terms of this Agreement. The cost of such independent certified public accountants shall be borne by the withdrawing Member, and such determination shall be made as expeditiously as reasonably possible.

56. Thus, the first step in reaching Fair Value is good-faith and reasonable negotiation between the Firm and the expelled member. The second step, if they cannot agree, is a determination by the independent public accountants regularly retained by the Firm.

**Expelled Member's Books-And-Records Rights**

57. This two-step Fair Value process does not exist in a vacuum. The Operating Agreement vests an expelled member with significant rights between expulsion and repurchase of his equity.

58. Under Section 8.6(a)(i), an expelled member expressly retains "the right to inspect the Firm's books and records."

59. That retained right is necessary. The right to inspect the Firm's books and records is essential to the good-faith negotiation of Company Value. The expelled member needs the Firm's financial information to assess Company Value during negotiation and, if no agreement is reached, to assess whether the accountant's valuation was impacted by fraud, bad faith, or mathematical error, or was otherwise not determined in accordance with the Operating Agreement.

**Neumann Requests Books And Records, And Defendants Refuse To Provide Them**

60. After his expulsion, Neumann asked the Firm to engage in good-faith and reasonable negotiations to agree on Company Value.

61. The Firm, through outside counsel, stated that it would treat either of two earlier valuations as Company Value. However, those valuations were stale and not conducted as of the date of Neumann's expulsion as the Operating Agreement required. Neither accounted for the Firm's current cash position as of that time. And one of them did not value Company Value correctly.

62. Neumann requested access to the Firm's books and records on multiple occasions, expressly invoking Section 8.6(a)(i) of the Operating Agreement, so that he could assess Company Value based on the Firm's actual performance and financials as of the date of his expulsion and use that assessment to negotiate in good faith and reasonably. He requested the Firm's financial records on September 23, 2026 and provided a list of the records he was requesting on October 2, 2026.

63. Neumann's counsel sent three letters expressing the need for the documents and requesting them.

64. Yet Defendants caused the Firm to fail and refuse to produce any records.

65. Before the sixty-day negotiation period expired, Defendants, through counsel, told Neumann's counsel that: (a) the Firm would not provide the records Neumann was requesting to calculate and negotiate Company Value; and (b) the Firm instead intended to ask the accountant to conduct the valuation.

66. Neumann proposed extending the negotiation period by approximately two weeks to give the Firm another chance to comply with Section 8.6(a)(i). The Firm did not respond and continued to refuse him access to the requested records.

67. The records Neumann seeks are within Defendants' possession and control. Without them, Neumann cannot accurately assess Company Value or any valuation conducted by the Firm's accountant.

68. Absent agreement as to Company Value, the Firm's regularly retained accountant will determine Company Value at Neumann's expense, and that determination will be binding and conclusive absent fraud, bad faith, or mathematical error.

69. Without the requested records, Neumann can neither negotiate Company Value nor evaluate whether the accountant's determination is tainted or is binding and conclusive.

70. Each Defendant is a member bound by the Operating Agreement, controls the Firm's books and records, and has the authority to cause the Firm to permit Neumann's inspection. Each has failed to do so.

**The Operating Agreement Permits Specific Performance Actions Against Defendants**

71. The Operating Agreement expressly permits any member to bring an action against the other members for their violations of it.

72. Indeed, Section 11.13 states:

> Each Member recognizes that, if he, she or it fails to perform, observe or discharge any of his, her or its obligations under this Agreement, . . . no remedy at law will provide adequate relief to the [Firm] and the other Members, as applicable. Therefore, the [Firm] and any of the Members, as applicable, are hereby authorized to demand specific performance of this Agreement and are entitled to temporary and permanent injunctive relief, without being required to post any bonds, in a court of competent jurisdiction at any time when any Member fails to comply with any of the provisions of this Agreement applicable to him, her or it . . . .

73. Section 11.13 repeats the authorization again for clarity:

> For the avoidance of doubt, the [Firm] and any of the Members may, in response to a breach of this Agreement by a Member, claim specific enforcement and/or injunctive relief in a court of competent jurisdiction and may request damages and other legal remedies as part of such proceedings . . . .

74. Defendants control the Firm and have refused to turn over the requested books and records or cause the Firm to do so.

75. Thus, Section 11.13 authorizes Neumann to bring this action for specific performance against them.

## COUNT I
## Specific Performance for Breach of the Operating Agreement

76. Neumann repeats and realleges the preceding paragraphs as if fully set forth herein.

77. The Operating Agreement (as amended) is a valid, binding, and enforceable contract.

78. Neumann has performed, or has been excused from performing, all his obligations under the Operating Agreement, and all conditions precedent to his rights under the Operating Agreement have occurred or have otherwise been excused.

79. Neumann and Defendants are all parties to the Operating Agreement.

80. Under the Operating Agreement, Neumann holds rights as a member, and Defendants owe him duties and obligations, including those set forth in Section 8.6(a)(i).

81. Defendants breached the Operating Agreement, including Section 8.6(a)(i), by failing and refusing to provide Neumann access to the Firm's books and records despite his repeated requests and by stating, through counsel, that no records would be provided.

82. Neumann has no adequate remedy at law to obtain the books and records. Under the Operating Agreement, when a member fails to perform his or her obligations under it, any member may demand specific performance under Section 11.13. Under Section 11.13, each member agreed that no remedy at law will provide adequate relief and irrevocably waived any defense based on the adequacy of a remedy at law.

83. In addition, the records are in Defendants' control and are needed before any Company Value determination becomes binding.

84. This action seeks specific enforcement only of Neumann's inspection rights, which Section 11.13 permits. His remaining claims are subject to arbitration under Section 11.15.

85. The requested relief is necessary to preserve the Fair Value process and the meaningfulness of that arbitration.

86. Neumann seeks an order of specific performance compelling Defendants to promptly produce the requested books and records or cause the Firm to do so.

87. Neumann also seeks an award of his attorney's fees and costs for bringing this case pursuant to Section 11.19.

WHEREFORE, Neumann respectfully requests entry of judgment in his favor and an order: (a) directing Defendants to permit Neumann to inspect and copy the Firm's books and records (including its financial statements, tax returns, all amendments to the Operating Agreement, member and unit records, and the records necessary to determine Company Value as of September 9, 2026); (b) awarding Neumann his attorney's fees and costs incurred in bringing this case; and (c) awarding Neumann such other relief as the Court deems just and proper.

Respectfully submitted,

STANTON | BARTON LLC

By: */s/ Jonathan T. Barton*________________
Jonathan T. Barton #47260
Megan M. Ratelle #72370
8000 Maryland Avenue | Suite 450
St. Louis | MO | 63105
314-455-6500
314-455-6524 (Fax)
jbarton@stantonbarton.com
mratelle@stantonbarton.com

AND:

Andrew P. Shelby (pending pro hac vice)
Kellye Fabian Story (pending pro hac vice)
Samantha Galinson (pending pro hac vice)
MICHAEL BEST & FRIEDRICH LLP
444 W. Lake St., Suite 3200
Chicago, Illinois 60606
andrew.shelby@michaelbest.com
kellye.story@michaelbest.com
samantha.galinson@michaelbest.com
(312) 222-0800

*Attorneys for Plaintiff John R. Neumann*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 13th day of November 2026, a true and exact copy of the foregoing was filed and served upon all counsel of record via the court's electronic notice system.

*/s/ Jonathan T. Barton*____________________